# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

IVAN NICHOLAS ROBERT,
                Petitioner,              Civil Action No. 1:04-cv-333

      vs.

GAYLE M. TESSON,           **REPORT AND RECOMMENDATION**
           Respondent.      (Weber, J.; Hogan, M.J.)

Petitioner Ivan Nicholas Robert (hereinafter "Petitioner") seeks the return of his children pursuant to The Hague Convention on Civil Aspects of International Child Abduction, October 25, 1980 (hereinafter "the Convention" or "Hague Convention"), and the International Child Abduction Remedies Act (hereinafter "ICARA"), 42 U.S.C. § 11601, et seq. This matter is before the Court following an evidentiary hearing at which both parties testified and presented evidence, and on the written closing arguments of the parties. (Docs. 61, 62). For the reasons which follow, the Court recommends the petition be denied.

## PROCEDURAL HISTORY

On May 17, 2004, Petitioner filed a Petition for Return of Children pursuant to the ICARA, 42 U.S.C. § 11601, *et seq*., alleging that Respondent wrongfully removed their children from France to the United States in violation of the Hague Convention. (Doc. 1). Prior to reaching today's decision on the merits of this case, the Court, with the complete support of both counsel, Barbara Howard and Greg Adams, strongly encouraged the parties to engage in guided mediation with the help of professionals, with the resultant goal of some form of shared custody.

Although the pursuit of mediation would delay a full hearing on and resolution of this matter, the parties nevertheless agreed to pursue this suggestion.  The result of the mediation is the subject of a pending Motion to Enforce the Settlement Agreement (Doc. 50) and Motion to Dismiss Motion to Enforce Settlement Agreement. (Doc. 54).  So as to avoid any semblance of prejudice or influence on the merits of the pending Petition, the Court informed the parties that it would stay any ruling on the motions to enforce and dismiss pending the resolution of the Petition on its merits.

This matter proceeded to an evidentiary hearing, first with Petitioner's trial deposition taken in Montreal, Canada on October 7 and 8, 2004, and then with hearings conducted on nine separate dates on November 22, 23, and 30, 2004, January 5, 6, and 7, 2005, February 7 and 8, 2005 and April 25, 2005.  By agreement, the parties have submitted their closing arguments by written brief. (Docs. 61, 62).

## FACTUAL BACKGROUND

The Court, after careful consideration of all the evidence submitted in this case, makes the following findings of fact.  Petitioner, Ivan Nicholas Robert, is a citizen of France who was raised in France and Algiers.  Respondent, Gayle Tesson Robert, is a citizen of the United States who was raised in Baton Rouge, Louisiana.  The parties met in 1994 in Houston, Texas while Respondent was engaged in the private practice of medicine with an anesthesiology group and Petitioner was engaged in training as a helicopter pilot.  At the time they met, Respondent was married to her first husband.  In 1995, Petitioner bought a self-service laundromat in France using money provided by Respondent.  Respondent also loaned Petitioner's mother the money to

2

purchase an interest in the laundromat.

It is clear to this Court from the evidence presented that Respondent and Petitioner had and possibly still have, mutual interests and shared values.  Among their mutual interests are the desire for a simple and uncluttered life, with an appreciation of nature and the preservation of the environment.  They enjoy being outdoors and participating in such outdoor activities as canoeing, biking and picnicking.  They love viewing sunrises and sunsets.  They like reading and, one can predict, the glow and warmth of a crackling fire.  They value time more than money.  The parties were married on January 6, 1996 in Northern France.

In early 1996, Petitioner applied for and obtained permanent resident status in the United States (a so-called "green card"), and the parties considered living in the Northwest quadrant of the United States.  On May 22, 1997, their twin boys, Thomas J. Robert and Alexis E. Robert, were born in Houston, Texas.  Respondent worked until a couple of months preceding her delivery in the private practice of medicine and at a Houston hospital.  The family continued to reside in Houston, Texas following the birth of the boys.  While Respondent attempted to return to work on a part-time basis shortly after the boys' birth, with Petitioner providing care for the children, the arrangement proved less than successful.  Respondent spoke of an incident when her husband called her out of the surgical arena to come home and tend to crying babies, a request with which she complied.  From May 1997 until September 1999, Respondent was essentially a stay-at-home mother.

In April, 1998, Petitioner, Respondent and the boys visited France to see a lot they had purchased in Cabris, France.  Petitioner testified that early on in their marriage, the parties decided they wanted to settle down and raise their children in France.  The couple purchased a

3

lot under the name of SCI-TAGIR, a French association, apparently for the purpose of limiting personal liability. The name TAGIR is a composite, formed by using the first initials in the names Thomas, Alexis, Gail, Ivan and the family name Robert. Respondent furnished the funds needed to purchase the lot. The parties ultimately decided not to build a home on the lot because, in Petitioner's view, the house that he designed was too large for the lot. Respondent testified that the lot was purchased as an investment. The lot was ultimately sold in July, 2003 for a large profit. After a short visit in France, the family returned to the United States.

In June 1998, the parties terminated their apartment lease in Houston and put all of their personal belongings into storage in Houston with a storage receipt and directions for these items to be shipped to Nice, France at such time as the parties directed the shipping company. (Pet. Exh. 4). The parties took a trip to the Northwest United States after leaving Houston. At some point during the intervening several months, Respondent and the children went to live with her sister in Virginia and then with her mother in Louisiana, while Petitioner unsuccessfully sought employment in the Northwest, ending up back in Houston to stay with friends and to sell the family car.

In December 1998, the entire family traveled to France. The family dog "Patches" accompanied them to France. Respondent obtained Patches in 1987 while she was an emergency room intern. The parties rented an apartment in the village of Cabris near the lot they had previously purchased. During this time, Petitioner worked at the laundromat businesses he owned jointly with his mother and sister in Cannes and Nice, France. Respondent described living in the apartment in Cabris from December 1998 to July 1999 as a stressful and unhappy period where she felt isolated and encountered much criticism, enjoyed little sleep and obtained

4

little help from her frequently absent husband. She described the apartment as cramped and the location as dangerous, due to its location next to a road where motorists frequently sped along and at a time when the twins were starting to be more mobile. It was during this period that the previously stressed marriage began to unravel. She testified that she and her husband had not shared a bedroom since the birth of their sons, that Petitioner slept on the couch in the Cabris apartment, and that Petitioner was disgusted with the process of nursing. Petitioner disagreed with this testimony, and testified that they slept side-by-side in the bedroom in Cabris by pushing two twin beds together, while the babies slept in fold-up "umbrella" beds. He also testified that they both agreed the boys should be breast-fed by Respondent. Petitioner also presented pictures of the Cabris rental and testified that it was roomier than Respondent described. The parties remained in the Cabris, France rental until June 1999, at which point they moved in with Mr. Robert's mother in France. The following month, Respondent left France with the children and returned to her mother's house in Baton Rouge, Louisiana and ultimately to the practice of medicine. Petitioner ostensibly remained behind in France to look for another property upon which to build or establish the family home. Patches, the family dog, remained in France with Petitioner and in June 2000 died and was buried in France at the age of 14.

Respondent testified that the marriage was "not working" when she and the boys left France in July 1999 to stay with her mother in Baton Rouge, Louisiana. According to Respondent's testimony, her marriage began to experience severe stress during the 1999 trip to France and that because of that fact, she returned to her mother's home to regain her emotional equilibrium. She had confided to a friend in Baton Rouge that she was severely depressed and embarrassed over the failure of her marriage and, after several months, agreed to return to work

in Baton Rouge, a place where she had not only family ties, but friends and professional

contacts. Respondent resumed the practice of anesthesiology in Louisiana on a "locum tenens"

basis. As Respondent described it, a locum tenens position is one filled by a doctor in a

particular specialty, such as anesthesiology, on a temporary or short-term basis to cover staffing-

shortages. In practice, Respondent's locum tenens positions generally lasted for one to several

months and usually during "high trauma" season when there was a greater need for

anesthesiologists. The locum tenens work allowed Respondent to work on a contract basis for

several months while earning a substantial income in a short period of time. Respondent and the

boys lived with her mother from July 1999 through May 2000. In June 2000, she rented an

apartment in Baton Rouge for herself and the boys, and listed her marital status as "separated"

on the rental application. However, she had not taken any formal steps to end her marriage at

this point.

       Thomas and Alexis attended pre-school in Louisiana during the 1999-2000 school year,

and a summer program thereafter. In the fall of 2000, when they were three years old, the boys

again attended pre-school through the remainder of the school year, and a summer program in

2001.

       In November 1999, Petitioner informed Respondent of another property in France in the

territory of the Commune of St. Vallier de Thiey that he believed would be a suitable place to

make their home. The house, "Mas Verdoline," needed extensive renovation and was located on

a fifteen acre lot. In December 1999, SCI-TAGIR purchased Mas Verdoline and the fifteen acre

lot upon which it sat. At the time of the purchase, the house in Mas Verdoline had no heat, no

running water, and no electricity as was typical of the homes on the road in this rural area. The

demolition and renovation was done by Petitioner over a period of years with help from subcontractors and/or friends who did roofing, plastering and assisted with the construction of structural beams.   Petitioner replaced windows and shutters, and installed a water and plumbing system, insulation, and solar panels to produce electricity.  Respondent participated in many of the decisions concerning the various systems for the house and oversaw the purchase and shipping of a very expensive refrigerator manufactured specifically for solar homes.  During the July 1999 to September 2001 period that Respondent and the boys resided in the United States, they made two short trips to France in March and November 2000.   Mas Verdoline was still under renovation at the time and not habitable.  In March 2001, Petitioner moved into the still uncompleted house.

The parties disagree on the state of their marriage during the July 1999 to September 2001 period that Respondent and the boys resided in the United States.  Petitioner testified that he and Respondent agreed that, in furtherance of their goal to build a home and reside in France, Respondent would take the children to the United States to visit with her family and work on a locum tenens basis while he continued to search for another place to build the family home.  In contrast, Respondent testified that the parties were separated and living apart during this point in their marriage.

In any event, Respondent testified that in May 2000, she and Petitioner decided to "reunite."  At this time, the parties agreed that Respondent and the boys would travel to France in September 2001 and send the boys to school in France. (Doc. 63, p. 135-36; Pet. Exh. 116). Respondent requested Petitioner to register the boys for the 2001-2002 school year in the middle section of a three-year preschool program in France.  Respondent testified that she and Petitioner

7

continued to have discussions about their marriage and Petitioner assured her "there is no more Cabris." Respondent understood this comment to be in relation to Petitioner's treatment of her during the previous stay in France in 1999. Respondent testified that Petitioner was in therapy on his own accord and she felt optimistic about giving their marriage another chance. She testified her current locum tenens position was ending in August 2001 and she had saved a sufficient amount of money to take time off from work to travel to France. Respondent testified that while she needed to work within a one year time period to keep up her hospital privileges, she felt confident the parties would have at least a couple of months to work on their marriage before she would have to find another locum tenens position. Respondent testified that the intent behind her September 2001 trip to France was to attempt a reconciliation because "everyone deserves a second chance."

In September 2001, Respondent and the boys traveled to France. Because the house was still uncompleted, the family rented a place in Cabris, which was very near the boys' school. The children attended French school with French being the language taught and spoken by the teachers and other students. The boys both understood and spoke fluent French by the end of the 2002 school year. (Pet. Exhs. 22, 23, 75, 139-146). Petitioner continued renovating the house in St. Vallier de Thiey and the family remained in the Cabris rental until June 2002 when the boys completed the school year. In July 2002, the family moved into Mas Verdoline, the house they had purchased in December 1999. The boys attended a summer program in France. Respondent testified that once the "newness" of the situation wore off, the marriage again became strained. She described Petitioner as controlling and angry, and frequently talking down to her. She testified that they discussed divorcing during this time. Petitioner denies they spoke of divorce.

8

Respondent testified she made arrangements for a locum tenens position in Denver, Colorado to begin in July 2002.  She agreed to leave the children in Petitioner's care in France because she would have no support system to help her with the boys in Denver and would be working at a demanding position in a level one trauma hospital.

Respondent left France for the United States in July 2002 to begin a new locum tenens position, running from July 23, 2002 to October 31, 2002, in Denver, Colorado.  The boys remained in France with Petitioner at Mas Verdoline.  In the fall of 2002, the boys were enrolled in and attended the Grande Section of the preschool program in France, in what would commonly be known in the United States as kindergarten.  Respondent testified that during this time she communicated frequently with the boys and prepared them for their return to the United States to live with her.  She testified that she and Petitioner agreed that she would return at the end of October to get the boys and return to Denver to reside.  Respondent's locum tenens position was extended by two weeks into the month of November.

Respondent returned to France in November 2002 and stayed for approximately two weeks.  She testified that while she intended her visit to be a short one, when she arrived in France it was discovered that Alexis was suffering from acute appendicitis which required a short hospitalization and recovery period.  Respondent testified that she and Petitioner again discussed divorce and Petitioner informed her they would have to pursue a divorce through the French court.  She testified that discussions on the division of assets got "touchy."  She also testified that the discussions got sidetracked given Alexis's hospitalization.  The attestation of Lynne Comery, a mutual friend of the Robert family who resides in France, states that Respondent had confided to her during Alexis's hospitalization that the parties had discussed

9

divorce.  Ms. Comery also states that she translated a French document for Respondent that

Petitioner had asked Respondent to sign concerning the sale of the Cabris property and the

possible future sale of Mas Verdoline.  The parties also agreed, through SCI-TAGIR, to sell the

lot in Cabris, France at the end of November.  The minutes of the SCI-TAGIR meeting also

reflect that the parties decided to put off  to a later date the sale of Mas Verdoline.

In December 2002, Respondent and the children left France and returned to Denver.  The

boys were enrolled in a Montessori school on December 10, 2002.  Petitioner testified that he

consented to Respondent taking the boys back to Denver, Colorado for the remainder of the

2002-2003 school year to attend the Montessori school while he finished the renovations on the

house.  He stated that he and Respondent agreed that Respondent and the boys would return to

France in June to prepare for the upcoming 2003 school year in France.  Respondent testified

there was no such agreement.  She testified that she would not have made such an agreement

because summer was "trauma season" and the busiest time for her job.  In mid-December 2002,

Respondent lowered the credit line from $50,000.00 to $5,000.00 on the credit card used by

Petitioner for renovations to Mas Verdoline. (Resp. Exh. 135).

Many exhibits presented show Respondent's address during 2002 to 2003 to be Mas

Verdoline in St. Vallier de Thiey, France.  These include a credit card statement of June 2002,

addressed to Mrs. Robert at the Mas Verdoline address (Pet. Exh. 11), a November 2003 bank

statement addressed to Mrs. Robert at the Mas Verdoline address (Pet. Exh. 12), and an

application for membership in an anesthesia research society and a certificate of completion of a

course in medical ethics (Pet. Exhs. 13 and 14), both of which are dated March 2002 and

addressed to Mrs. Robert at the Mas Verdoline address.  Also, there is an application for locum

tenens staffing that is dated June 2002 and lists Mas Verdoline as Mrs. Robert's "preferred address." (Pet. Exh. 33).  In addition, there are multiple exhibits, most of which are dated during the period from September to December 2003 and consisting of financial statements, correspondence from insurance companies, correspondence from IRS, etc. which list the Mas Verdoline address and are directed to Respondent.  (Pet. Exhs. 53-71).

In contrast, Respondent has presented documents for this same time period showing Colorado and Louisiana addresses for Dr. Robert.  These include documents concerning her participation in continuing medical education (Resp. Exh. 59), medical equipment purchases, phone bills, insurance statements, various publications, tax statements and forms, credit card statements, and various bills. (Resp. Exhs. 65-75, 104).

Respondent and the boys did not return to France in June 2003.  Respondent extended her locum tenens contract and spent the summer in the United States with the boys, working at a Denver hospital and taking various trips to Yellowstone National Park, Florida, and Baton Rouge, Louisiana to visit relatives.  Some time in the summer of 2003, Petitioner informed Respondent that the lot in Cabris had sold for 1.2 million francs.  During that same period, Respondent sent Petitioner a note she prepared which requested, among other things, a car with air conditioning, a French driver's license and a residence card. (Pet. Exh. 126).  Petitioner testified that a tourist or visitor can drive in France for three months without a French driver's license.  Respondent testified she wanted a residence card to be on an a "level playing field" with Petitioner in any divorce proceeding in France.

In September 2003, Respondent terminated her apartment lease in Colorado and notified her banks, credit card companies, investment account companies, and other entities of her

forwarding address to Mas Verdoline in St. Vallier De Thiey, France. (Pet. Exhs. 13, 48, 50, 52, 53, 55, 57-71). Respondent also shipped several boxes to France, which included medical equipment, lab coats and journals, the children's fall and winter clothing, personal items, cooking utensils, children's books and toys, French language and grammar books and workbooks with exercises completed in Respondent's handwriting, childhood memorabilia including drawings she had done as a child, a medal she had won in an event as a child, and her high school yearbook pictures, and various other belongings. (Pet. Exhs. 51, 89, 147-50, 151). Respondent testified that she had these things mailed to France "in case [she] didn't want to go back to Denver" and have the items "stuck in storage." (Doc. 65 at 121). She also testified that some of her belongings were left in storage in Colorado to enable her to move things to another place if she got another locum tenens position in Colorado or elsewhere. Respondent testified that while she had an open invitation to return to Denver to work, she was concerned about the cost of living and the financial condition of the hospital.

On September 19, 2003, Respondent and the boys left Colorado and returned to France. Respondent testified she wanted to confront Petitioner in person about the state of their marriage and to hopefully work out an amicable divorce. She also wanted to obtain her portion of the proceeds from the sale of the lot in Cabris, and to give the boys a chance to visit with Petitioner. Respondent testified that upon arriving in France, she and the boys received a chilly reception from Petitioner at the airport. She testified that Petitioner did not acknowledge or hug the boys and expressed surprise that they actually came to France. Petitioner denies this testimony and states he greeted the boys, but was unhappy with Respondent because of trouble locating the correct airport terminal. Respondent testified that the condition of the house, with a few

12

exceptions, was much the same as when she left in December 2002 and that the toilet and

bathing conditions remained primitive.  There was no running water and no functioning toilet.

Bathing occurred via a sponge bathe in a bucket of heated rainwater without walls for privacy.

She testified that she and the children were asked to urinate outside and defecate into a makeshift

toilet, *i.e.*, a bucket with a wooden seat placed over it.  Toilet paper was placed in a nearby bag.

There was no staircase, but rather a work ladder, to access the second floor loft area where she

and the children slept.  There were no internal walls and the safety rails surrounding the second

floor loft area had been taken down.  Respondent testified that she created a barrier with boxes

so the children would not fall to the first floor.  Respondent testified that Petitioner was annoyed

by the noise the children made while playing and that she enrolled the children in school to get

them out of the house, give them a structured environment for the time being, and to give her and

Petitioner a chance to discuss a divorce.  She testified that Petitioner was frequently angry with

her and the children because of their disruption of his routine and inability to keep to a schedule.

During this stay in France, Respondent met with a French lawyer about obtaining a divorce from

Petitioner.

Petitioner testified that once the children adapted to the time zone change and their

environment, about ten days after their arrival, they were enrolled in school for the 2003-2004

academic year.  The children were enrolled in the Preparatory Class at the St. Vallier de Thiey,

which was mandatory and the equivalent of the first grade in the United States.  The children had

not been enrolled in any school program in the United States for the academic year.  According

to Petitioner, shortly after Respondent and the boys arrived in France the major systems in the

house were connected with a few additional items still left to be done, such as the installation of

13

the wood-burning stove and the completion of the hardwood floor on the second floor of the home.  Petitioner testified that the toilets were functional prior to October 8, 2003, and that the connections to the bathtub and kitchen sink were in place and ready to be hooked up.  Petitioner testified that he was waiting for Respondent and the boys to arrive so they could select the sink and fixtures together.

On the morning of October 8, 2003, Respondent and Petitioner had an argument concerning a family outing to the city of Nice to do the laundry.  The argument escalated for reasons not pertinent to this decision.  Petitioner testified that he suggested to Respondent, for the first time, that perhaps they did need to consider whether they should consider a divorce.  Petitioner ultimately left in the family automobile by himself to Nice.

Respondent testified she was emotionally distraught and made the immediate decision to leave France with the boys.  Respondent wrote a brief note to Petitioner that she was leaving with the boys to visit her sick mother and left the note on her bed.  She testified that this was not the real reason for her leaving, but viewed it as a "face-saving" device for Petitioner.  She then arranged for a taxi ride to the Nice airport, packed her and the children's belongings, and left.  Respondent and the boys flew to New York City.  After a day or two, Respondent began driving West with no specific destination in mind, other than perhaps Denver, Colorado or Baton Rouge, Louisiana.  Respondent telephoned a friend, Mark Campbell, whom she testified she had met during a Florida beach vacation the previous month in September 2003.  Respondent then traveled to Lebanon, Ohio where she and the boys resided with Mr. Campbell and his parents in the parents' single family residence.  The boys were enrolled in the first grade in the Lebanon City Schools on October 17, 2003.  Respondent testified that she spoke with Petitioner on

14

November 2, 2003 and told him she was pursuing a divorce and cancelling his credit card.

When Petitioner returned home from Nice on October 8, 2003, he discovered Respondent and the children were not present. Later that evening, he received a phone call from a woman who was an acquaintance saying she had received a phone call from the Nice airport security telling her they had found an address book at the Nice airport, and it became clear that the address book belonged to Respondent. Petitioner searched the house and discovered the note from Respondent. This was the first and only time that Respondent had taken the children without his knowledge or consent. After several days, Petitioner reached Respondent and was told she was in Ohio because the children had gotten very sick and she had decided to stay there until they recovered. Later, Petitioner discovered that Respondent had, within a week's time of her arrival in Ohio, enrolled the children in the Lebanon City Schools. Petitioner later determined that Respondent was living in the residence of Mark Campbell and his parents.

On March 22, 2004, Petitioner filed a criminal complaint in France against Respondent concerning the "abduction of children and retention outside of France." (Pet. Exhs. 96, 96a). Petitioner testified that once reported, the matter is then taken up by the French government which decides whether or not to proceed. On February 23, 2005, the Public Prosecutor for the Tribunal de Grande Instance of Grasse, France, charged Respondent with violations of Article 227-7 and 227-9 of the French Penal Code. (Resp. Exhs. 180, 181). A violation of Article 227-7 is punishable by one year's imprisonment and a fine of 15,000 euro. Article 227-9 is punishable by two years imprisonment and a fine of 30,000 euro. Respondent testified that it is unlikely she would attempt to appear in France to defend against these charges and because of the pending charges, there are no circumstances under which she would travel to France. The effect of a

15

conviction on either of the charges on Respondent's ability to practice medicine in the United States is unknown, but of great concern to Respondent.

Respondent presents evidence that prior to October 8, 2003, when they returned to the United States, the boys spent 72% (56 months) of their lives in the United States and 28% (22 months) in France.

Both Respondent and Petitioner have good insight into the twins' different personalities. Various declarations of family members, friends and teachers provided by both parties would indicate that each have a sincere interest in the boys' education and training, and much to contribute toward the rearing of the twins. Nevertheless, each has filed for divorce/separation and asked the respective courts for custody of the twins.

Petitioner has a degree in forestry and is licensed as a helicopter pilot. Petitioner may be described as "handy" and able to work with tools. He presents as a rather rigid individual with perfectionist leanings. He may lack the ability to bring projects to completion, although the desire is certainly there, as is evidenced by the time it has taken him to complete the renovation of the Mas Verdoline home, despite the fact that he had ample time to do so and the benefit of a credit card provided by Respondent and despite the fact that his wife and children were expected to and did reside there during part of the renovation period.

For some unexplained reason, Petitioner has failed to regularly communicate with his boys since they left France on October 8, 2003. Subsequent to October 8, 2003, Petitioner made two trips to the United States, one in December 2003 and one in February 2005. Petitioner states he has not visited the United States on other occasions so as not to subject himself to the jurisdiction of the domestic relations court in the United States. He has failed to send birthday or

16

Christmas gifts to his children and refuses to talk with them on the telephone or send faxes or e-mails despite Respondent's urging that he do so.  Petitioner's insistence on his preferred face-to-face method of communication ignores the obvious need of the children to feel their father's love through attention given to them contemporaneously.  His desire that they retain a pleasant image of him as a result of shared experiences in the past is naive.  That absence makes the heart grow fonder is not an applicable psychiatric principal when it comes to effective child rearing.  That Petitioner loves his boys is obvious; that he has much to learn about how to deal with them in an effective way is equally obvious.

On the other hand, Petitioner has much to offer his children.  The house in St. Vallier is now completed and is something about which Petitioner can be understandably proud.  It is high-tech and environmentally friendly in every sense.  What is truly remarkable is that Petitioner, a person not trained in engineering, architecture or the construction trades, at least not formally, has been able to accomplish much of the work himself while relying on instructional pamphlets and the advise of others.  One would hope that over time, the children, when they reach a more mature age, can learn such things from their father.

Respondent is licensed to practice medicine in several states in the United States.  She must work regularly in her profession or she will be unable to maintain hospital privileges as an anesthesiologist.  Maintaining such privileges is essential to her employability.  She does not speak French and is not able to practice medicine in France.  It would take several years for Respondent to be licensed to practice medicine in France because she would need to gain a medical degree in France and complete her medical residency requirement.  Respondent is, without question, a loving and capable mother who has managed to balance a demanding

17

professional life with her parental responsibilities. She has expressed her disapproval of divorce

for religious reasons and a willingness to try again and again to salvage her second marriage.

She is a respected professional, and quite capable of an annual income in the $400,000 range,

most of which she is willing to sacrifice in favor of a quiet life with her family. Although

Petitioner has a small income from his family's laundromat business in France and has

abandoned efforts to fly helicopters for a living, it is as clear to this Court as it was to the couple

that Respondent not only was, but was expected to be, the breadwinner and her sole source for

the generation of income was her medical practice in the United States.

Respondent submitted evidence from Dr. Daniel Nelson, the Director of the Child

Psychiatric Unit at Children's Hospital Medical Center in Cincinnati, Ohio. Dr. Nelson is a

board-certified physician in child, adolescent, and adult psychiatry. On the basis of multiple

interviews with the children, information supplied by Respondent, and a telephone interview

with Petitioner as well as written correspondence from Petitioner, Dr. Nelson found "compelling

evidence" suggesting the children view their "cultural orientation and their habitual residence"

as being with their mother in the United States. (Resp. Exh. 173 at 5-6). Dr. Nelson opines that

the children's primary language is English and that the children found "it difficult in France

because they didn't understand the language and English was spoken to them primarily by both

parents even while they resided in France." *Id*. at 6.[1] He believes the children view their primary

caretaker to be Respondent and because of their attachment to her, "any placement that would

lead to protracted separation of the twins from their mother would be consistent with forced

---

[1]     Dr. Nelson's report references a "visit of September 2002" to France. (Resp. Exh. 173 at 2, 5, 6).
The parties and Dr. Nelson agree that this is a typographical error that should read September "2003." (Doc. 67 at
109).

abandonment" which, in Dr. Nelson's opinion, would be "more severe than a child who is in the zone of war, disease, or famine but who retains maternal support." *Id*. at 7.  He opines that if the Court were to order the children to return to France "and mother was not able to care for the children a majority of the time the children with reasonable medical certainty are at grave risk of psychological harm due to forced maternal abandonment." *Id.*  On cross-examination, Dr. Nelson admitted that his interviews with the boys occurred one year after the children left France and had resided in the United States, but felt that the information and perceptions he obtained from the children could be related back to their time in France in October 2003.  Dr. Nelson also admitted he considered the children's entire lives in rendering his opinions, including from October 8, 2003, the date they left France, to November 22, 2004, the date of his expert report, a time period subsequent to the children's removal from France.  Dr. Nelson also stated that the "facts" he obtained in rendering his report were obtained primarily from Respondent and his report is based on the assumption that those "facts" are accurate.


**DECISION**

The Hague Convention on Civil Aspects of International Child Abduction was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Friedrich v. Friedrich*, 983 F.2d 1396, 1399-1400 (6th Cir. 1993)(*Friedrich I*)(citing Hague Convention, Preamble).   The Convention seeks to deter parents from crossing borders in search of a more sympathetic forum, *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)(*Friedrich II*)

19

(citing Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986)); *Friedrich I,* 983 F.2d  at 1400, and

"to deprive [their] actions of any practical or juridical consequences." *Gitter v. Gitter*, 396 F.3d

124, 130 (2nd Cir. 2005), citing Elisa Perez-Vera, Explanatory Report, in 3 Conference de La

Haye de droit international prive, Actes et Documents de la Quatorzieme session, Enlevement

d'enfants 426, 429, ¶ 16 (1982).[2]  The Convention is designed to restore the pre-abduction status

quo "by means of 'the prompt return of children wrongfully removed to or retained in any

Contracting State.'" *Id*.  Both the United States and France are signatory nations. *In re Prevot*, 59

F.3d 556, 558 (6th Cir. 1995).

Pursuant to the International Child Abduction Remedies Act, state and federal courts

have concurrent jurisdiction over actions arising under the Convention. 42 U.S.C. § 11603(a).  A

person seeking the return of a child under the Convention may commence a civil action by filing

a petition in a court where the child is located. 42 U.S.C. §11603(b).  Under the Convention, a

court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but

not the merits of the underlying custody dispute. Hague Convention, Article 19; 42 U.S.C.

§11601(b)(4); *Friedrich II,* 78 F.3d at 1063-64; *Friedrich I*, 983 F.2d at 1400; *Rydder v. Rydder*,

49 F.3d 369, 372 (8th Cir. 1995); *Feder v. Evans-Feder,* 63 F.3d 217, 221 (3d Cir. 1995).

Under the ICARA, Petitioner bears the initial burden of providing by a preponderance of

the evidence that the children have been "wrongfully removed or retained within the meaning of

the Convention."  42 U.S.C. §11603(e)(1)(A); *Friedrich I*, 983 F.2d at 1400.  Pursuant to Article

3 of the Convention, the removal of a child from one country to another is wrongful when:

---

[2]      Elisa Perez-Vera was "the official Hague Conference reporter for the Convention." Hague
International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,503. "Her explanatory
report is recognized by the Conference as the official history and commentary on the Convention." *Id*.

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, Article 3.   Once Petitioner has satisfied his burden, the children must be

returned to France unless Respondent can demonstrate one of the following defenses to return:

1) by clear and convincing evidence that there is a grave risk that the return of the children would expose the children to physical or psychological  harm, Hague Convention, Article 13b, 42 U.S.C. § 11603(e)(2)(A);

2) by clear and convincing evidence that the return of the children "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms;" Hague Convention, Article 20, 42 U.S.C. § 11603(e)(2)(A);

3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment; Hague Convention, Article 12; 42 U.S.C. § 11603(e)(2)(B); or

4) by a preponderance of the evidence that the Petitioner was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced  in the removal or retention; Hague Convention, Article 13a; 42 U.S.C. § 11603(e)(2)(B).

*Friedrich I*, 983 F.2d at 1400.

Therefore, as a threshold matter, Petitioner must prove by a preponderance of the

evidence that Petitioner was exercising his parental custody rights over the children at the time

of removal under the law of  the state of the children's habitual residence and that Respondent

removed the children from their "habitual residence."  If Petitioner carries this burden,

Respondent may look to one of the four affirmative defenses mentioned above.

21

**THE PETITION FOR THE RETURN OF THE
CHILDREN SHOULD BE DENIED ON THE MERITS**

I. <u>Prima Facie Case of Wrongful Removal</u>

A.  <u>Exercising Custody Rights</u>

The first issue the Court addresses is whether Petitioner was exercising his parental rights over the children at the time of their departure from France on October 8, 2003 under Article 3 of the Hague Convention.  Custody rights over children "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." Hague Convention, Article 3.  Under French law, the father and mother have joint rights of parental authority: "The father and mother shall exercise in common parental authority." Article 372 of the French Civil Code. (Pet. Exh. 99).  Parental authority is defined under the French Civil Code as "a set of rights and duties whose finality is the welfare of the child.  It belongs to the Father and the Mother until the majority or emancipation of the child in order to protect him in his security, health and morality, to ensure his education and allow his development, showing regard to his person." Art. 371-1, French Civil Code.  With regard to this issue, the Sixth Circuit has stated that "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066.

In this case, French law gave Petitioner custody rights over the children. (See Pet. Exhs. 99, 122).  The facts before us establish that Petitioner exercised those rights at the time of removal.  Moreover, Respondent has offered no evidence to suggest that Petitioner clearly abandoned those rights prior to the children's removal from France or that Petitioner failed to

exercise his custody rights over the children.  Thus we find that Petitioner had custody rights

over the children as a matter of French law and was exercising his parental rights over the

children at the time of their removal from France on October 8, 2003.


B. Habitual Residence Immediately Before the Removal

The next issue the Court must determine is where the children were "habitually resident

immediately before the removal" by Respondent from France.  The Convention does not define

"habitual residence."  In the oft cited British decision *In re Bates* (1989), the court cautioned

flexibility in determining the habitual residence of a child:  "It is greatly to be hoped that the

courts will resist the temptation to develop detailed and restrictive rules as to habitual residence,

which might make it as technical a term of art as common law domicile.  The facts and

circumstances of each case should continue to be assessed without resort to presumptions or

presuppositions. . . .  All that is necessary is that the purpose of living where one does has a

sufficient degree of continuity to be properly described as settled." No. CA122.89 at 9-10 (High

Court of Justice, Family Division Court, Royal Court of Justice, United Kingdom).  *See*

*Friedrich I*, 983 F.2d at 1401, citing *In re Bates* with approval.[3]  "On its face, habitual residence

pertains to customary residence prior to removal." *Friedrich I*, 983 F.2d at 1401.  "[A] child's

habitual residence is the place where he or she has been physically present for an amount of time

sufficient for acclimatization and which has a 'degree of settled purpose' from the child's

perspective." *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)(relying on *Friedrich I* and

---

[3]        Because *Friedrich I* was decided before any courts in the United States had provided guidance on
the concept of habitual residence, the Sixth Circuit looked to the British case of *In re Bates*, No. CA 122.89, High
Court of Justice, United Kingdom 1989 for assistance in this determination.

*In re Bates*).

The Sixth Circuit addressed the issue of habitual residence in *Friedrich I*.  In *Friedrich*, an American mother stationed with the United States Army in Germany married a German citizen with whom she had a child. 983 F.2d at 1398. The family lived exclusively in Germany, with the exception of a few short vacations, until the child was approximately one and a half years old, at which time the mother removed the child to the United States. *Id.* at 1398-99.  The mother argued the child was a habitual resident of the United States because: (1) he had United States citizenship; (2) the United States was listed as his permanent address for the purpose of documentation; and (3) she intended to return to the United States with her son when she was discharged from the army. *Id.*  The Sixth Circuit disagreed, holding that the child was a habitual resident of Germany at the time of his removal despite the mother's future plans for the child to reside in the United States.  The Court explained, "To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Id.* at 1401.  The Sixth Circuit stated that "[a] person can only have one habitual residence" and, in response to the mother's claim that the child's habitual residence shifted to the United States when she became the primary caretaker, stated:

> [H]abitual residence can be 'altered' only by a change in geography and the passage of time, not by changes in parental affection and responsibility.  The change in geography must occur before the questionable removal. . . .  If we were to determine that by removing [the child] from his habitual residence without Mr. Friedrich's knowledge or consent Mrs. Friedrich 'altered' [the child's] habitual residence, we would render the convention meaningless.  It would be an open invitation for all parents who abduct their children to characterize their wrongful removals as alterations of habitual residence.

*Id.* at 1402.

*Friedrich* was characterized as a "simple case" for determining the habitual residence of

24

the child who was born in Germany and resided exclusively in Germany before his removal to

the United States. *Id*. at 1402.  Unlike *Friedrich*, the instant case is not so simple.  The Robert

children's physical residence between the United States and France over the pertinent six and

one-half years changed no less than five times as the following timeline illustrates:



The children's

seemingly nomadic lifestyle between two countries and within the United States itself over their

six and one-half years prior to October 8, 2003, coupled with issues of the parents' credibility,

renders this case anything but simple in determining the children's habitual residence

immediately prior to their removal from France.

Our starting point in determining habitual residence is of course with *Friedrich I* which directs the court to "focus on the child, not the parents, and examine past experience, not future intentions." 983 F.2d at 1401.  Subsequent to the *Friedrich* decision, the Sixth Circuit has not revisited the issue of habitual residence as it relates to more complex factual scenarios as are present in the instant case.  However, the Circuit Courts of Appeals since *Friedrich* which have grappled with the issue of habitual residence have recognized the importance of examining the intentions of the persons entitled to fix the place of the children's residence, usually the parents, in determining the habitual residence of the child.  *See Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005); *Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004); *Holder v. Holder*, 392 F.3d 1009, 1015-16 (9th Cir. 2004); *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003); *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001).  Because children "normally lack the material and psychological wherewithal to decide where they will reside" the intentions of the parents are relevant in determining the habitual residence of the children. *Mozes*, 239 F.3d at 1076.  "Focusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location.  This approach allows an observer to determine whether the child's presence at a given location is intended to be temporary, rather than permanent." *Gitter*, 396 F.3d at 132.

Where the parents agree on the habitual residence of the child, an absence of a short or temporary duration does not change the habitual residence because there is no intent to abandon the one left behind.  In cases where the parents disagree as to the place of the children's habitual residence, however, "the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a

26

child has already agreed to the child's taking up habitual residence where it is." *Mozes*, 239 F.3d at 1076.  These cases can be divided into three categories.  The first are "cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move.  Most commonly, this occurs when both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new country.  When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." *Mozes,* 239 F.3d at 1076-77 (footnotes and case citations omitted).  The second are "cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period.  In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id*. at 1077 (footnotes and case citations omitted). The third are "cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration.  Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely.  When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence.  Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred." *Id*. (footnotes and case citations omitted).

The intent of the parents cannot alone determine the children's habitual residence.  As

indicated above in *Friedrich I*, a change in geography *prior* to the removal is a necessary prerequisite to acquiring a new habitual residence. 983 F.2d at 1402. In addition, there must be a sufficient period of time for the child to have become acclimated. *Mozes*, 239 F.3d at 1078. *See also Gitter*, 396 F.3d at 133; *Ruiz*, 392 F.3d at 1253. In considering whether a child has become sufficiently acclimated, the Court should not place undue emphasis on factors such as the child doing well in school and with friends. "Despite the superficial appeal of focusing primarily on the child's contacts in the new country, however, . . . in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned" because "[t]he greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try." *Mozes*, 239 F.3d at 1079. *In accord Ruiz*, 392 F.3d at 1254. Because children are remarkably adaptable, it "makes sense to regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making." *Mozes*, 239 F.3d at 1079-80 (internal footnotes omitted). When there is no settled parental intent to abandon a prior habitual residence, "a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence, or if the court could 'say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed.'" *Ruiz*, 392 F.3d at 1254, quoting *Mozes,* 239 F.3d at 1081 (citation omitted). *See also Gitter*, 396 F.3d at 134.

       Applying these factors to the instant case, the Court first examines the period of May

1997, when the twins were born, through September 2001, when Respondent and the boys traveled to and remained in France for a period of one year and three months.  From May 1997 to December 1998, the boys resided with their parents in the United States.  In December 1998, the family traveled to Cabris, France for eight months.  In July 1999, while Petitioner remained in France, Respondent and the boys returned to the United States and remained in the United States until September 2001.  Thus, with the exception of eight months spent in France, the boys' first four years and four months of life were spent in the United States.

There is little dispute that Petitioner never intended to make the United States his habitual residence.  Although Petitioner obtained a "green card," had considered living in the Northwest quadrant of the United States in late 1998, and had sought employment in the United States, we believe that his dislike for the American way of life for himself prevented the formation of any intention on his part to live in the United States on a permanent basis.  Yet, it is undisputed that the *boys'* presence in the United States from May 1997 to September 2001 was with Petitioner's consent.  The evidence shows that the boys' customary and ordinary residence was with Respondent in the United States for this time period.  The geographical presence of the boys in the United States for four years and four months, less the eight month visit to France, coupled with factors such as developing English language skills, developing close attachments to their maternal grandmother and other family members, attending preschool, and making friends during this period, establish that the children were acclimated to their life in the United States and had "a sufficient degree of continuity to be properly described as settled." *Friedrich I*, 983 F.2d at 1401 (citation omitted).  While Petitioner contends that the joint family purpose was nevertheless to reside in France in the home he was building at some future time, as will be

29

discussed in greater detail below, this intent, even if true, cannot in itself make France the habitual residence of the children for this time period without their physical presence in France. *Friedrich I*, 983 F.2d at 1402. Therefore, the Court finds the children's habitual residence from their birth in May 1997 to September 2001 was the United States.

The Court must next determine whether the boys' habitual residence in the United States was abandoned in favor of France after September 2001. In September 2001, Respondent and the boys traveled to France. Respondent remained in France with Petitioner and the children until July 2002 when she traveled to Denver, Colorado for a locum tenens position. The boys remained in France with Petitioner for the four months Respondent was working in Colorado. In November 2002, Respondent returned to France. In December 2002, Respondent and the boys returned to Denver, Colorado. The boys remained in the United States for approximately ten months from December 2002 to September 2003. In September 2003, Respondent and the children returned to France for a three week period leaving again for the United States on October 8, 2003. In short, starting in September 2001, the boys lived in France for one year, three months, then the United States for ten months, then France for three weeks before they left France for the United States on October 8, 2003. The Court must determine whether the facts and circumstances from September 2001 through October 8, 2003 show the children ceased to be habitually resident in the United States.

In answering this question, the Court must in turn address two questions. First, was the children's established habitual residence in the United States effectively abandoned by the shared intent of the parents? Second, in the absence of such shared intent, do "the objective facts point unequivocally" to the conclusion of a new habitual residence in France? *Mozes*, 239 F.3d

30

at 1082.  *See also Gitter*, 396 F.3d at 134; *Ruiz*, 392 F.3d at 1254.   The Court determines that Petitioner and Respondent had no *shared* intent to abandon the established habitual residence of the boys in the United States in favor of France and that the objective facts do not point unequivocally to a new habitual residence in France.  The Court acknowledges that there is evidence supporting both sides in this case, and that this case is a close one.

On the question of shared intent, the Court finds there was no shared agreement between the parties to establish a new habitual residence in France given the persistent problems that plagued the parties' marriage over the years and the fact that Respondent's, as well as the family's, livelihood was based in the United States.  Respondent's move to France in September 2001 was conditioned on her marriage ultimately working.  Respondent testified that she decided to give the marriage a second chance and that the move to France in September 2001 was an attempt at reconciliation.  Respondent contends that she did not logically formulate a plan for her young children to live in France on a permanent basis when her marriage to their father was in jeopardy and contact with her family and means of employment were in the United States.  We find this assertion credible as it is consistent with the history of the parties' marriage.  There is ample credible evidence that the parties' marriage was strained from an early date.  The evidence shows that following the family's visit to France in December 1998 through July 1999, the parties separated because their marriage was not working and not for the reasons posited by Petitioner.  When Respondent returned to the United States with the boys in July 1999 to live with her mother, Petitioner remained in France.  At the time, Respondent was not employed and therefore her motivation for returning to the United States in July 1999 was not to earn money to finance "the project," but rather to spend time away from Petitioner.  Only after several months

31

in Louisiana and through the encouragement of a friend did Respondent seek and gain work in a

locum tenens position in a Louisiana hospital.

      In addition, despite Petitioner's professed ignorance to the contrary, the evidence shows

he was well aware that he and his wife were experiencing marital problems prior to October

2003.  While Petitioner repeatedly testified that the couple never spoke of divorce and that he

had no idea that Respondent was contemplating a divorce until he located legal papers left

behind by Respondent after she left in October 2003, his letter to Respondent, written in early

2000, supports a contrary conclusion.  He writes: "[Like the piloting that] flew away from me, so

does the dreamed life . . when the better life is about to become a concrete reality, financially

and mentally, it slips away like water between the fingers . . . your sudden determination last

night made me sad and lost." (Resp. Exh. 116).  Petitioner also testified that he received a letter

from Respondent around June 2000 which he understood to mean they may live separately in

France, with Respondent taking up residence in Mas Verdoline with the boys and he in Cabris.

(Pet. Exh. 101).  It is apparent from this evidence that rather than showing an intent to live

permanently in France, Respondent was exploring various options for stabilizing her relationship

with Petitioner in France while at the same time maintaining the security of her livelihood,

employment possibilities, professional relationships, and family support in the United States as

an "escape valve."  Respondent's trip to France in September 2001 was an attempt at

reconciliation and whether or not it could actually be attained was dependent upon the passage of

time.  One does not reconcile or in Respondent's words "reunite" without both a commitment

and the passage of time.  The Court does not characterize Respondent's intent as a permanent

commitment, but rather as a conditional attempt.  The Court believes that while Respondent may

have initially viewed Mas Verdoline as her residence, as her marital relationship diminished her intentions regarding Mas Verdoline were modified accordingly.  Considering the unstable status of the marriage, the Court finds Respondent did not form an intent to make France the new habitual residence of the children when she and the children traveled to France in September 2001.  The evidence shows that Respondent's move to France in September 2001 was conditioned on the successful reconciliation of the parties and that Respondent's move to France was not intended to be an abandonment of the established habitual residence of the United States for a life in France.  Accordingly, the parties held no shared intent to abandon the United States as the habitual residence of the children in favor of a new habitual residence in France.

In the absence of shared intent, the Court examines the evidence to determine whether "the objective facts point unequivocally" to the conclusion of a new habitual residence in France. Petitioner contends that the boys' move to France in September 2001 was consistent with the family goal of establishing their life in France.   Petitioner testified that early on in their marriage, he and his wife planned to make France their habitual residence.  In furtherance of that mutual goal, they jointly purchased the lot in Cabris and ultimately Mas Verdoline.  He asserts that Respondent provided the financing for the project by making periodic jaunts to the United States to work on a "locum tenens" basis, while he performed the physical labor to realize their "dream" of a simple and quiet life in southern France.  The storage of furniture and personal property for shipment to France after the parties terminated their apartment lease in Houston, Texas, coupled with the transfer of the canine "Patches" to France during the 1998-99 stay in France, support this position.  A bank account was opened in France in early 1998 to enable Petitioner to make the necessary purchases in furtherance of the project.  The fact that

33

Respondent chose to practice medicine on a locum tenens basis, as opposed to a permanent full-time or part-time basis, also supports Petitioner's position.

In addition, while Respondent and the boys were still living in the United States in May 2000, she directed Petitioner to register the children for the 2001-2002 school year in France and find them a place to live.  By that time, the parties had purchased the house Mas Verdoline in St. Vallier, France, and Petitioner was renovating the home.  When Respondent and the boys returned to France in September 2001, the family as a unit lived in a rental in Cabris until July 2002 when the family moved into Mas Verdoline.  At the time she left the United States in September 2001, Respondent had no other housing arrangements in the United States. Respondent participated in the decisions for Mas Verdoline, such as selecting solar power for electricity, and major purchases for the home, such as the purchase and shipping of an expensive solar refrigerator.  The only real property that the couple owned was located in France and Petitioner, albeit at a snail's pace, was developing the property with funds provided by his spouse for use as a home.  While Respondent testified that she viewed Mas Verdoline as an investment or a summer home, we do not find that testimony credible.  The design of the house and the elaborate electrical and water systems installed indicate the house was intended to be the family's residence.  One does not equip a home with a solar refrigerator for investment purposes, and it is clear that the solar refrigerator was purchased as a fixture and not as a item of personal property severable from the real estate at a sale.  The children were enrolled in preschool in Cabris upon their arrival, engaged in social interactions with extended family members and other children in France, and learned to understand and speak French fluently.  During the summer months, the boys participated in a summer program near Mas Verdoline.   The family received

34

financial and other non-monetary benefits provided by the French government as well.

Respondent directed important mail, such as bank and investment statements, continuing medical

education correspondence, and medical journals, to the Mas Verdoline address in France.  Dr.

Robert's curriculum vitae indicates that for the period from "September 2001 to present" as

"living overseas with family." (Pet. Exh. 16).  In the fall of 2002, the boys enrolled in the Grande

Section of the preschool program in France, the equivalent of kindergarten in the United States.

In all, the children resided in France for one year and three months before they left for the United

States with Respondent in December 2002.

These facts undoubtedly support Petitioner's contention that for the year and three

months the children lived in France they had become acclimated to the French culture and to life

in France.  However, because the children already had a clearly established habitual residence in

the United States, the question the Court must answer is "not simply whether the children had in

some sense 'become settled' in [France]" but whether France had supplanted the United States

"as the locus of the children's family and social development." *Mozes*, 239 F.3d at 1084.

Viewing the unique facts of this case and the pattern of living developed by the parties

over the pertinent six and one-half years of the boys' lives, the Court concludes that France did

not replace the United States as the focus of the children's family and social development in the

context of this case.  The conditional move to France in 2001, coupled with facts showing the

failure of the parties to reconcile and subsequent return of Respondent and the children to the

United States in December 2002, was consistent with the pattern of living established by the

parties over the lives of the children and does not point unequivocally to a new habitual

residence in France.

As indicated, the children's presence in France was conditioned on the successful reconciliation of their parents. The attempted reconciliation failed and the evidence shows that in November 2002, when Respondent returned to France from Denver, Petitioner was well aware of that fact. The Court finds credible Respondent's testimony that she and Petitioner discussed a separation of assets during November 2002 when Alexis was hospitalized. The attestation from Lynn Commery supports Respondent's assertion that the parties discussed divorce and selling the marital real property in November 2002. (Resp. Exh. 171). In addition, the minutes of the SCI-TAGIR meeting which were written by Petitioner and which show the contemplated sale of Mas Verdoline in November 2002 support the conclusion that the parties failed to reconcile. The potential sale of the "family home" would make no sense otherwise. Finally, Respondent's lowering of the credit limit from $50,000 to $5,000 on the credit card Petitioner used for renovations to Mas Verdoline supports Respondent's testimony that she distrusted Petitioner during a time they were talking about divorce. The evidence shows that by the end of 2002, the parties took steps away from establishing a family life for the boys in France in favor of one in the United States to which the boys were accustomed.

The children's return to the United States with Respondent in December 2002 was consistent with the pattern of living previously established by the parties. After the boys returned to Denver with their mother, they were enrolled in kindergarten at a Montessori school on December 10, 2002. They moved into the apartment previously rented and furnished by Respondent in preparation for their return. Petitioner consented to their return to the United States, and although he states he anticipated the boys return to France in the summer following the conclusion of the school year, we find more credible Respondent's testimony that there was

36

no agreement to return to France and because summertime was "high trauma" season in the

hospital, she was expected and required to fulfill her locum tenens obligation in this regard.  The

boys continued in school through May 2003, then attended a summer program in Denver.  The

evidence shows Respondent and the boys took a family vacation with Respondent's sister and

her family to Yellowstone National Park in July and visited their maternal grandmother in

August after Respondent's locum tenens position ended.  During this time the children were

becoming more and more socialized in the United States and had scant contact with their father.

This settled pattern of life in the United States exhibited by the Robert children from December

2002 through August 2003 is consistent with that previously established by the parties.

    Since habitual residence means customary residence prior to the removal, the pattern or

custom that the parents established was for the children to be with Respondent in the United

States for the greater part of their lives.  When the couple was not together, they saw fit to have

the children reside with Respondent in the United States, with the sole exception of the four

month period in the latter half of 2002 when the boys lived with Petitioner in France.  With the

exception of the 2003 summer months the boys spent in Denver with Respondent, it is

undisputed that the parties were in agreement about the amount of time Respondent and the boys

spent in the United States while she was working.  The evidence shows that whenever

Respondent traveled to the United States with the boys, with the exception of the October 2003

incident, it was with the consent of her husband.  Because Respondent was the breadwinner and

could only practice medicine in United States, it was necessary that she spend extended periods

of time in the United States.  As the primary breadwinner who spoke little French, Respondent

was required to practice medicine in the United States to maintain her license.  Petitioner agreed

to this arrangement and was dependent upon Respondent's income to purchase and renovate the house (as was true of the purchase of the lot in Cabris and Petitioner's share of the laundromat business in France).  When  the children were with Respondent in the United States, they were largely ignored by both Petitioner and all members of Petitioner's family.  Petitioner rarely telephoned or visited the boys in the United States and for the most part did not participate in holiday and birthday celebrations for the boys.  In contrast, the children have a much closer relationship with their maternal grandmother and Respondent's siblings and their families who reside in the United States.  Petitioner demonstrated from the incident in Houston that he could not handle very young children and because it was necessary that he work on renovating the house, he lacked both the time and support system for the care of the twins while he was working on the house.  As a result, 72% of the children's lives were spent living in the United States with their mother.   Whether or not this was to change as the children grew older was expressed by Respondent and borne out by the evidence:  "My goal was to stay at home as much as I could with my children until they were school age and then I would reevaluate how much they tolerate my being away."  Finally, the Court credits Dr. Nelson's testimony that the children viewed the United States as "home" and France as a place to visit and that their French language skills, although probably more developed than Dr. Nelson believes, were not comparable to their English language skills.  When the family was together in France, English was the language spoken to the children at home, a point which Petitioner concedes.  The children's habitual residence in the United States was established by the Respondent's lifestyle to which Petitioner not only consented, but was dependent upon.  From the children's birth until October 8, 2003, the family and social development of the children centered around their lives with Respondent in

the United States.  Our focus on the past experiences of the Robert children and their family leads to the conclusion that the habitual residence of the children remained the United States and was not abandoned in favor of a new habitual residence in France.

Respondent's return to France with the children in September 2003 for a three week period does not alter this conclusion.  Respondent purchased round trip airline tickets for herself and the children departing on September 18 and returning three weeks later on October 8, 2003. Respondent admitted that a return to the United States in three weeks was not a definite plan, but was dependent on the length of time needed to hopefully obtain an amicable divorce, to give the children time to spend with their father, and to obtain her share of the proceeds from the sale of the Cabris lot so she could have a better chance of buying a home for the boys in the United States.  Her actions prior to arriving in France support an inference that she and the boys intended to live in France for at least some indeterminate length of time.  Respondent shipped to France  seven boxes of various items, including two seasons worth of clothing for herself and the boys, personal memorabilia, medical equipment, and the boys' medical records.  Prior to arriving in France, Respondent sent Petitioner a note requesting a car with air conditioning, a French driver's license and a residence card.  Respondent also forwarded important mail to France after leaving Colorado and had made no arrangements to live elsewhere within the United States upon the termination of the lease on the Denver apartment.  Yet, whatever Respondent's intent may have been, the circumstances upon her arrival were such that a stay of any appreciable length of time was neither practical nor realistic.  Immediately upon arriving in France in September 2003, Respondent and the children received a cool reception from Petitioner at the airport.  En route to Mas Verdoline, Petitioner faxed an order for a wood burning stove to be installed at a later date

39

in the house as a source of heat for the house.  Respondent discovered the house to be in much

the same apparent condition as when she and the children left ten months earlier.  Mas Verdoline

was inhabitable only in the roughest terms and was not in a condition for a primary caregiver and

two young children.  For instance, there was an open staircase, no interior walls, and the floor

boards on the second floor were only partially laid.  The bathroom facilities at Mas Verdoline

were equivalent to what might be termed "primitive."  There was still no running water and the

family was required to take sponge baths in a bucket of heated rainwater.  The toilet was not

connected and consisted of a bucket with a makeshift wooden seat.  We can only imagine what it

must have been like guiding a youngster to the toilet in the middle of the night from a second

floor construction site with a flashlight to a bucket on the first floor.  The Court does not believe

Petitioner's testimony that the plumbing at Mas Verdoline was operational during his wife's last

visit.  There is a vast difference between the system being "in place" and all connections made so

that a toilet flushes and water runs from faucets.  From his tone, manner and demeanor, we

believe Petitioner to be stretching the truth when he testified otherwise.  The Court also credits

Respondent's testimony that the relations between Petitioner and herself and the children were

often tense and confrontational, and that she and Petitioner frequently argued.  While the

children were enrolled in school in France, they attended school for approximately one week.

Shortly after her arrival in France, Respondent began serious efforts to obtain a divorce in

France.  Respondent met with a French lawyer in October intending to take concrete steps to

terminate the marriage.  On the morning of October 8, 2003, Respondent and Petitioner had an

argument of a nature such that Petitioner suggested that perhaps they consider divorce.

Respondent admitted that her abrupt departure from France with the boys was without

40

Petitioner's knowledge or consent.  While the note or "Dear John" letter left on a bed at Mas

Verdoline explaining that "Mom is very sick . . ." as a purported explanation for Respondent's

sudden departure from France on October 8, 2003 was not an accurate portrayal of the facts, we

believe Respondent wrote an untruth in order to avoid an unpleasant confrontation with her

husband and to allow her to leave the country without a scene at the airport.  However, the Court

finds incredible Respondent's testimony that upon return to the United States in October 2003

and upon landing in New York, she drove to Louisiana via Lebanon, Ohio.  We believe the

purpose of the trip to Lebanon was to rendezvous with Mark Campbell, an acquaintance of some

sort whom Respondent met on a Florida beach during the summer of 2003.   The Court does not

credit her testimony to the contrary, that she stopped in Lebanon, Ohio in order for a sick child to

recuperate.

Despite the unorthodox and somewhat disturbing actions surrounding Respondent's

abrupt departure from France, the Court nevertheless cannot find that the children's three weeks

stay in France resulted in the abandonment of the United States as their habitual residence.

While Respondent initially intended to stay in France for an indeterminate amount of time, in

reality the stay lasted only three weeks.  This short amount of time was insufficient for the boys

to become acclimated to French culture, language and life, having spent the previous ten months,

as well as the majority of their lives, in the United States.  The facts do not point

"unequivocally" to boys' habitual residence in the United States being abandoned for France.

The Hague Convention requires the Court to determine where the children were

"habitually resident immediately before the removal."  Because the Court finds the Robert

children were habitually resident in the United States immediately before their departure from

France on October 8, 2003, the Court finds no wrongful removal under the Hague Convention.

Accordingly, the Petition for Return of Children (Doc. 1) should be denied.

## WHETHER THERE IS A GRAVE RISK THAT THE RETURN OF THE CHILDREN WOULD EXPOSE THEM TO PHYSICAL OR PSYCHOLOGICAL HARM

Petitioner has failed to shoulder his burden of establishing the element of habitual

residence in France.  For the sake of completeness, however, the Court shall address whether,

assuming, arguendo, the habitual residence of the children is France, Respondent meets her

burden of showing by clear and convincing evidence an affirmative defense in this action.

Under the Hague Convention, if Petitioner had established that the children were

wrongfully removed from France, the children must be returned unless Respondent can establish

that any of the Hague Convention's affirmative defenses apply.  42 U.S.C. § 11603(e)(2);

*Friedrich II,* 78 F.3d at 1067.  Respondent contends that the children should not be returned to

France because there is a grave risk that doing so would expose the children to psychological

harm.

In addressing the issue, the Sixth Circuit observed that "[t]he exception for grave harm to

the child is not license for a court in the abducted-to country to speculate on where the child

would be happiest." *Friedrich II*, 78 F.3d at 1068.  The exception is narrow and requires more

than psychological evidence of "adjustment problems that would attend the relocation of most

children." *Id*. at 1067.  Rather, a grave risk of harm exists in only two situations:

> First, there is a grave risk of harm when return of the child puts the child in
> imminent danger prior to the resolution of the custody dispute – e.g., returning the
> child to a zone of war, famine or disease.  Second, there is a grave risk of harm in
> cases of serious abuse or neglect, or extraordinary emotional dependence, when

42

the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich II*, 78 F.3d at 1069.  The *Friedrich* Court explained that the grave risk of harm exception is not meant to be a vehicle to litigate the child's best interests:

> Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an *intolerable* situation is material to the court's determination.  The person opposing the child's return must show that the risk to the child is grave, not merely serious.
> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.  An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child.  If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.  Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich II*, 78 F.3d at 1068-69, citing Public Notice 957, 51 F.R.10494, 10510 (March 26, 1986) (emphasis in the original).

In this case, Respondent places much emphasis upon the expert report of Daniel Nelson, M.D., a board certified child psychiatrist.  Dr. Nelson opines that a protracted separation of the children from their mother, who is their primary care-giver, would subject them to a grave risk of psychological harm.  Dr. Nelson regards the mother of the boys as the focal point of their lives and considers the country of their residence as relatively unimportant if the majority of the time is spent with their mother.  Dr. Nelson states:

> There is a reasonable medical certainty the forced protracted separation from their mother represents a grave risk of psychological harm.  Unlike the situation wherein children reside in a country with both parents and a disappointed or disgruntled mother or father flees the country with the children in hand, these children in fact face forced separation from what has been known and is familiar

43

the clear majority of their life if they were to return to France.  The loss of a fundamental primary caregiver especially the maternal caregiver represents the most stressful life experience any child may face with the exception of fears of annihilation, physical, or sexual abuse without the support of the caregiver to help buffer the insult.

Apart from separation from the mother, the children are not so deeply rooted in [the] United States or its culture such that moving them to France with the support of frequent contact with mother would represent a great risk of psychological harm or otherwise create for them an intolerable situation.  If it is possible for these children to continue to have a majority of time with their mother, a move to France for these children would not put them at grave risk of psychological harm.

(Resp. Exh. 173 at 3).

This Court is convinced that were it to order the children returned to France, Respondent would accompany them in order to make the transition as smooth as possible *if she were able to* until the French court made the custody determination.  Under such circumstances, the Court concludes that there would be no grave risk of psychological harm to the children.   However, the likelihood that Respondent would accompany the children to France is significantly diminished in light of the criminal charges against Respondent which are pending in France.  A court hearing  in the French criminal case on the child abduction charges has been continued until December 2005.  The charges carry as the maximum penalty a period of incarceration of two years and a substantial fine.  While the likelihood of incarceration is disputed by the parties, it is clear that Respondent could not provide maternal support from a jail cell.  The United States is not required to extradite Respondent and thus she has no intention of leaving her protected status in this country to attend court sessions in France and risk being immediately detained.  We do not know whether or not Respondent would be able to obtain a pretrial release of some sort in France, but it would likely be of concern to a French court that there is no extradition agreement

44

between France and the United States and that Respondent has no employment in France.

Respondent would have no realistic choice but to forego a return to France with her children if

this Court ordered the children sent there.  The children, without their mother's presence, would

likely be subject to some risk of psychological harm if forced to go to France without her and

were separated from her during the pendency of the French court's custody determination.

Nevertheless, the standard the Court must apply is that of "grave" risk of psychological harm.

Respondent must establish that the risk to the children is "grave, not merely serious." *Friedrich

II*, 78 F.3d at 1068.  While Dr. Nelson opined that "the forced protracted separation" of the

children from their mother "represents a grave risk of psychological harm," it is undisputed that

the boys were in the sole custody of Petitioner in France for a four-month period in 2002 and that

they sustained no psychological harm whatsoever as a result of their separation from their

mother who was working in the United States during this time period.  During this time,  the

children received frequent phone calls and faxes from Respondent.  The children were able to

feel their mother's presence in this way even though they were an ocean apart.  Since Petitioner

was adequately financed by Respondent, he had ample time and the resources to be the primary

caregiver for this period and there is no evidence the children suffered any psychological harm

from the absence of their mother.  There is every reason to believe that if the children were

ordered returned to France their mother would continue to communicate with them through

correspondence, faxes, and telephone calls as she did in the past during the time the boys were in

the sole custody of their father.  Therefore, the Court does not believe a separation between the

boys and their mother for the time it took the French court to determine the custody issues would

amount to "forced maternal abandonment" and therefore would not constitute a grave risk of

psychological harm.  It is undisputed the children would not be returned to any other type of circumstances that would place them in imminent harm, such as to a war zone, or to an area of rampant disease or famine. *Friedrich II*, 78 F.3d at 1069.  Nor is there any evidence of serious abuse or neglect, or extraordinary emotional dependence or that the French courts are incapable of or unwilling to protect the children. *Id*.  Therefore, Respondent has failed to establish by clear and convincing evidence one of the exceptions under the Hague Convention assuming the children were ordered to return to France.

## CONCLUSION

**IT IS THEREFORE RECOMMENDED** that the Petition of Ivan Nicholas Robert be denied because the habitual residence of Alexis and Thomas Robert was and is in the United States.  In the event this recommendation is not accepted and the Court finds the habitual residence of the Robert children is France, Respondent has failed to demonstrate by clear and convincing evidence that if the children were ordered returned to France for a custody determination by a specialized French court, the children would be subject to grave psychological harm during the relevant period.

Date:   6/29/2005                                              s/Timothy S. Hogan
                                                               Timothy S. Hogan
                                                               United States Magistrate Judge

46

# NOTICE

Attached hereto is the Report and Recommended decision of the Honorable Timothy S. Hogan, United States Magistrate Judge.  Any party may object to the Magistrate's findings, recommendations, and report within ten (10) days after being served with a copy thereof or further appeal is waived.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Such parties shall file with the Clerk of Court, and serve on all Parties, the Judge, and the Magistrate, a written Motion to Review which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made along with a memorandum of law setting forth the basis for such objection, (such parties shall file with the Clerk a transcript of the specific portions of any evidentiary proceedings to which an objection is made).

In the event a party files a Motion to Review the Magistrate's Findings, Recommendations and Report, all other parties shall respond to said Motion to Review within ten (10) days after being served a copy thereof.